## UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT FILED

ETHAN BOOK JR.
    Plaintiff

    v.                                          :     Case No

RICHARD TOBIN
    Defendant

MARTIN L. NIGRO
    Defendant

2004 MAR 16  A 10: 16

U.S. DISTRICT COURT
BRIDGEPORT, CONN
3:04CV442(JBA)

---

## CIVIL RIGHTS COMPLAINT

### A. PARTIES

1.  ETHAN BOOK JR. is a long-term citizen of the State of Connecticut residing in the Town of Fairfield, 805 Kings Highway East, Fairfield, CT 06825.

2.  Honorable Richard Tobin is a citizen of the State of Connecticut and works as a Superior Court judge assigned to Stamford Superior Court, 123 Hoyt Street, Stamford, CT 06905.

3.  Honorable Martin L. Nigro is a citizen of the State of Connecticut and works as a Superior Court judge assigned to Stamford Superior Court, 123 Hoyt Street, Stamford, CT 06905.

### B.  JURISDICTION:

4.  The jurisdiction of this federal court is invoked pursuant to the U.S. Fourteenth Amendment, 42 U.S. Code, Section 1983, also 42 U.S. Code, Sections 1981, 1985, 1986 and 1988, the 1st, 6th and 8th Amendments and the common law conspiracy doctrine.  Through various state court actions including Conn. Resources Recovery Authority et al. v. Freedom of Information Commission et al., 19 Conn.App. 489 (See also AC 7414, PSC-94-0290, AC 19437, PSC-00-0499.), E. Book v. Freedom of Information Commission, AC 22359, PSC-01-0469, State v. E. Book dba New England Limousine Service of Fairfield, AC 22496, State v. E. Book, AC 22399, and also various administrative actions including with the Conn. Claims Commissioner (re: E. Book v.

<u>Stamford Superior Court, Judicial Branch and Office of the State's Attorney,</u> Files No. 19126 and 19483), there has been exhaustion of state remedies for related issues pertaining to E. Book.

## C. NATURE OF THE CASE

E. Book has been known in the State of Connecticut as a whistleblower of state activities in resource recovery, a role which began in 1985 with his experience in specialized banking.  After having worked with Bank of America in Latin America and then in New York City (The work in New York City was in the Bank of America section of specialized financing to electric utility companies.), in early 1985, E. Book accepted a position with Conn. Bank & Trust Co. (CBT).  He was Vice President in the CBT Bridgeport Commercial Office.  Early 1985 was a time that the State of Connecticut was in early stages of developing several large resource recovery (i.e., "garbabe-to-energy") projects.  With his specialized experience in regulated industries, E. Book was asked by his bank superiors to review such state activities.  The primary focus of his attention was for the greater Bridgeport area including the redevelopment of a large-scale mass-burn project sponsored by the Conn. Resources Recovery Authority (CRRA) and a smaller-scale independent project planned by the Town of Stratford.

Early in his review of such proposals, E. Book saw some warning signals for the proposed CRRA project for greater Bridgeport.  For example, he observed that the proposed Bridgeport project was grossly oversized.  In addition, with access to the proposed contract between the CRRA and Signal Environmental Systems, Inc. (aka Wheelabrator Technologies, Inc.), the developer/ operator for the Bridgeport Project, E. Book observed that the proposed contract was very favorable to Signal.  When E. Book presented his observations to his superiors, after working only for 7 months with CBT, he was quickly and harshly fired (See attached text of article of April 6, 1987 of the <u>Bridgeport Telegram</u>.).

E. Book has two advanced degrees, both with honors.  One of the degrees is from the American Graduate School of International Management ("Thunderbird"), located in Glendale, AZ, a specialty school where E. Book also served as student body president.  He also served a successful two-year term in the U.S. Peace Corps in Bucaramanga, Colombia.  In addition, E. Book worked very successfully for about 7 years with Bank of America.  However, with the unresolved political implications for his brief experience in Connecticut with CBT, he was unable to get other work in banking.  In addition, for the domestic implications of the discharge from CBT, also with various overt acts from local political figures observedly intended to disrupt his family life, on June 2, 1988, there was a long-distance marital separation involving E. Book's wife, then of 16 years, and his three young sons.  That separation, which resulted in new residence of E. Book's

wife and three sons in the State of Idaho, observedly violated both state and federal laws of child custody.  However, E. Book was not able to obtain reasonable support from state and local law enforcement agencies for that substantive issue.

As an alternative livelihood, E. Book began a limousine service business.  Shortly after beginning such livelihood, E. Book observed yet other warning signals.  Officials of the Conn. Dept. of Transportation (DOT) appeared to be exceeding their authority in manners similar to officials of the CRRA.  He was observing some arbitrary official actions which tended to impede his pursuit of the limousine service business.  E. Book did more review and learned that the DOT Commissioner is also a member of the CRRA board of directors.  He also observed that the manner that the DOT attempts to administer state livery statues, including CGS, Sec. 13b-103 is an improper, unlawful intrusion in the 1st Amendment right of association (an apparent cornerstone to the concept of free enterprise in the U.S.).  Thus, E. Book began also to challenge such official positions in state and federal court.  While doing so, E. Book also encountered numerous indications of invidious discrimination against him by DOT officials (See State v. E. Book v. New England Limousine Service of Fairfield, AC 22496.).

E. Book also took various steps to obtain additional information regarding his observations of CRRA problem activities.  Particularly through the Conn. Freedom of Information Act, E. Book obtained a substantial amount of additional information through which he identified incidents of bid-rigging, bond fraud, mail fraud and other unlawful activities.  E. Book presented such information to the Conn. Auditors of Public Accounts and the Conn. Attorney General (then under the direction of Joseph Lieberman).  However, nothing of substance was done to resolve the matters.

E. Book presented such matters and related issues in several cases in federal court.  Such cases included E. Book v. Fed. Deposit Insurance Corp. (pursuant to federal Freedom of Information Act), Case No. 3:04-cv-01651, E. Book v. FDIC as Receiver for CBT, Case No. 3:95-cv-00001, E. Book v. Conn. Commission on Human Rights & Opportunities, Case No. 3:95-cv-00421, E. Book v. CRRA, Office of Attorney General, Office of the Chief State's Attorney, Dept. of Transportation, Town of Fairfield and First Boston Corp., Case No. 3:95-cv-01344, and E. Book v. U.S. Securities & Exchange Commission, Case No. 3:95-cv-00838.  The above cases against the CRRA and CHRO were administered in federal court by Judge Dominic Squatrito, who less than six months before administering the cases, was the official campaign treasurer for Joseph Lieberman (It is relevant here that there was some investigation by the U.S. Dept. of Justice about the appointment of D. Squatrito as was suggested by Joseph Lieberman and recommended by President William Clinton.  There is the appearance of improper influencing by empresario David Chase, a personal friend of Joseph Lieberman and then a defendant in a federal case filed by a

former Texas employee, one who was wrongfully treated by the Chase enterprises in Poland, among other matters.  A pending formal impeachment petition against Judge Squatrito was presented to Congress by Congressman Henry Bonilla of Texas.).  All the above cases were dismissed in federal district court and were appealed to the U.S. Court of Appeals.  There continues to be some remedy for these matters available to E. Book, however, there also appears to have been some political imbalance against him as a self-represented litigant.  E. Book's proper gestures before the U.S. Court of Appeals were interrupted for the wrongful official acts which are the subject of the present petition (E. Book is aware that in some other appellate circuits, there is directed attention to reopening cases of self-represented litigants where there is the possibility that the interests of justice have not been served.).

In the above setting where E. Book operated a limousine service while he continued to pursue other remedy for the unresolved state activities in resource recovery and of their adverse impacts to his banking career, E. Book developed recipriocal business relationships with various other local limousine service companies.  Such business relationships were primarily for exchange overflow work.  One of those relationships was with Martha Villamil, owner/operator of Park Avenue Limousine Service based in Stamford, CT.  M. Villamil, of Colombian background, is the widow of the late Carlos Villamil, one who was shot to death by Michael Butler, a driver of the business.  Reportedly, there was a dispute over payment for driving services.

After E. Book and M. Villamil met during about 1992, there were various intercompany business activities and occasional conversations about dating.  During about 1996, there was one casual dating encounter.  Following that, there continued the usual business relationship.  In early 2000, there was more conversation between the two about dating.  From late May through early July 2000, there was limited consentual dating.  For reasons which were not well explained, shortly following an inspection performed on her business by the DOT, M. Villamil decided to end the dating relationship.  However, at the same time, she affirmed that she would pay to E. Book pending business debt which then amounted to about $1,500.  She never told E. Book not to contact her and she never said that she did not want to continue the business relationship.

At first following M. Villamil's comment of not wanting to date, E. Book was solicitous of her.  However, after M. Villamil failed to respond, E. Book then focused on attempts to collect the debt, and also on relationship closure as that might pertain to her disposition to pay the debt.  For a period of about five months, E. Book initiated 2 to 3 peaceable communications per month.  There was never any violence, no threats, no late night phone calls, and no no-talk phone calls.

After five months of not receiving any reponse from M. Villamil (except for various second-hand comments made by M. Villamil about E. Book to third parties), on Thursday, January 4, 2001,

after dropping passengers off at LaGuardia Airport, on his return to Fairfield during early afternoon hours of a business day, E. Book stopped by M. Villamil's business office. He knocked on the door. There was no response so he walked to her mailbox and left his business card. The next day, he followed up with a very simple telephone message asking M. Villamil to contact him.

On the evening of January 5, 2001, E. Book received a telephone message from Sgt. Anthony Lupinacci of the Stamford Police Department. E. Book promptly returned the message. Sgt. Lupinacci explained that M. Villamil had presented a formal harassment complaint and he wanted E. Book to come into the police station to talk about the matter. E. Book agreed. A meeting was then scheduled for the following afternoon.

E. Book timely arrived to the Stamford police station. He was met by Sgt. Lupinacci and Ofcr. Paul Mabey. E. Book began the meeting by giving background of his relationship with M. Villamil with information very similar to the above explanation. Very quickly in the meeting, Sgt. Lupinacci told him not to contact M. Villamil again. E. Book was then aware of various provisions for protection of speech and he specifically referred during that meeting to <u>Gormley v. Director, Conn. State Department of Probation</u>, 101 S.Ct. 591, 449 U.S. 1023 [See also 632 F.2d 938 (1980). Also see Conn. Regulations, Sec. 36a-647-4.]. E. Book told Sgt. Lupinacci that he had just violated his 14th Amendment rights. Sgt. Lupinacci advised E. Book not to go by M. Villamil's property and he also said that he would speak again with M. Villamil and get back to E. Book on the following day. He stated this several times.

Sgt. Lupinacci never got back to E. Book on the following day, or the next or the next after that. Without the follow-up from Sgt. Lupinacci that had been repeatedly affirmed, E. Book logically believed that there was no substantive issue so he presented several peaceable communications to M. Villamil (See attached texts of three such communications.).

Without any other warning or notice, on Friday, January 19, 2001, E. Book was arrested for stalking and harassment, both non-violent misdemeanor charges. A bond of $25,000 was imposed upon him, also a no-contact protective order was issued.

During the proceeding, Mitchell Rubin of the Office of the State's attorney represented the state. M. Rubin had represented the state in four earlier cases against E. Book of violations of the state livery statutes (motor vehicle violations pursuant to CGS, Sec. 13b-103). For those cases, after numerous pre-trial hearings sometimes extended over a period of several years, the cases were all nollied. For the present matter, without reasonable explanation, M. Rubin opposed that the case be referred to Family Relations. Also, by arguing that the charges were serious, M. Rubin opposed that the protective order would be vacated. However, shortly following the pre-trial

court review of the protective order, the state dropped the stalking portion of the charges, the more serious of the two misdemeanor charges. Also, the state curiously included in the charges the communications made to M. Villamil prior to the meeting with Stamford police where the vague, verbal and unlawful warning was given. Such action is inconsistent with legal precedent and the 14th Amendment. In this manner, there were 34 counts of misdemeanor harassment.

The matter eventually went to trial. Shortly prior to the trial, Public Defender Thomas West reportedly commented to an acquaintance that the attorneys of Stamford Court and the Stamford judges intended to see E. Book convicted as he has been a thorn to the state in other forums.

The trial was to be administered by Judge Richard Tobin, the same judge who had approved the arrest warrant. With primary focus on the presumed warning given by Sgt. Lupinacci, and also an incomplete Court Reporter readback of that warning (See attached pages 8 and 9 of a Supplement of Jan. 16, 2003 to a pending Motion of November 14, 2001 for Reconsideration of Court Ruling regarding acquittal/rehearing.), on October 2, 2001, E. Book was acquitted of 10 counts of harassment and convicted of 24 counts. E. Book took steps to appeal the case. A sentence was imposed on October 31, 2001 and an appeal bond was granted.

Because of a high level of bias which E. Book observed of Judge Tobin, following the trial, E. Book contacted Judicial Branch Operations to obtain Judge Tobin's financial disclosures. E. Book was surprised to learn that Judge Tobin receives an annual pension of $53,000 from Cummings & Lockwood, the law firm which during the trial was formally contracted with the CRRA to be the CRRA outside legal counsel. E. Book promptly presented a Motion for Disqualification of Judge Tobin.

During mid 2002, the Conn. Appellate Court raised the issue of time of filing the appeal. E. Book's initial notice of appeal was filed on October 17, 2001. That notice specifically mentioned several pre-trial decisions of the type that are distinctly appealable. Following the October 31, 2001 imposition of sentence, that appeal notice was timely amended on November 19, 2001. The issue raised *sua sponte* by the Appellate Court was that E. Book's notice of appeal may have been too early. Because of the fact that E. Book's initial filing of the appeal specifically incorporated pre-trial decisions which are distinctly appealable (i.e., trial court action on referral to Family Relations and also on protective order), E. Book believes that his appeal filings were correct. Nonetheless, during October of 2002, the Appellate Court dismissed the appeal for reportedly being too early. E. Book wasn't very concerned about that Court decision as he had pending before the Stamford Superior Court his Motion of November 14, 2001 for Reconsideration of Court Ruling regarding acquittal/rehearing.

On January 9, 2003, the Stamford court clerk sent to E. Book written notice for a disposition hearing for January 17, 2003. There was no mention of revoking the appeal bond. E. Book received no copy of any motion to revoke the appeal bond. E. Book thus prepared for the hearing by completing a Supplement to his pending Motion of November 14, 2001 regarding acquittal/rehearing.

When he arrived to Court on January 17, 2003, M. Rubin referred to the Appellate Court dismissal of the appeal and he verbally suggested that the sentence be imposed. E. Book objected by referring to his pending Motion for acquittal/rehearing, for which he commented in Court that any decision would be appealable, and he offerred to the Court his prepared Supplement, a document which also included newly-discovered evidence. Judge Richard Tobin refused to accept the Supplement. Without any action on the pending Motion for acquittal/rehearing, Judge Tobin revoked the appeal bond and imposed the sentence. Also, there was no ten-day delay period for commencement of the sentence as is provided for in Practice Book, Sections 61-11 through 14.

Promptly upon his arrival to Bridgeport Correctional Center, E. Book mailed to Stamford Superior Court the original Supplement. Also, on about January 20, 2003, he mailed to the Court a Motion to Vacate Imposition of Sentence. Further, on about January 21, 2003, he sent to the Court a Motion for Reconsideration Regarding Revocation of Appeal Bond. In that Motion, there is an explicit statement of intent by E. Book to appeal the case. On February 10, 2003, E. Book sent to Stamford Superior Court a new notice of appeal.

However, E. Book never received the endorsed notice of appeal, the necessary step to begin the appeal process. He sent letters and gave telephone messages to the Court regarding the matter. In addition, authorized third parties living in Bridgeport called the Court Clerk on behalf of E. Book about the status of these matters. Then in late April, E. Book learned of the significance of his statement of intent to appeal with respect to a stay of sentence [CGS, Sec. 54-95(b)]. He brought these matters to the attention of the Court. On May 15, 2003, Judge Tobin called E. Book to Court and without any reasonable explanation, he ordered E. Book not to contact the Court Clerk by telephone.

E. Book did not receive any reply to his pending motions regarding acquittal/rehearing, regarding notice of appeal, stay of sentence, etc. He even sent to the Court several formal requests to reclaim the pending motions.

On November 6, 2003, E. Book presented to the Court an Application for Waiver of Fee and Appointment of Counsel. That was denied on November 20, 2003 by Judge John Kavenewsky

without opposition, without a hearing and without explanation.  On November 26, 2003, E. Book presented a Motion for Reconsideration of that ruling.

On January 8, 2004, E. Book was discharged by the Dept. of Correction.

On January 21, 2004, E. Book received a Memorandum of Decision of Judge Martin L. Nigro in which E. Book's Motion for reconsideration regarding application for waiver of fee and appointment of counsel was denied by him on January 9, 2004.  The same decision made reference to all other pending motions (presumably including also E. Book's Motion of 11/14/01 for Reconsideration regarding acquittal/rehearing) which were stated to be denied.  On January 22, 2004, E. Book presented to the Court a Motion for Reconsideration of that decision.  That Motion was heard on March 10, 2004 at which time Judge Nigro denied the Motion.  According to the comments given in open Court, Judge Nigro presumes that the Court did not have jurisdiction for E. Book's Motion of November 14, 2001 for Reconsideration of Court Ruling regarding acquittal/rehearing.  At no place did E. Book ever receive or hear any opposition by state attorney M. Rubin about the Motion of November 14, 2001 regarding acquittal/rehearing, or about the Supplement offered to the Court on January 17, 2003 (a pleading which included newly-discovered evidence), or to the various applications for waiver of fees and appointment of counsel.

With regard to the yet unresolved public issues of state activities in resource recovery, E. Book feels like he is a witness, victim and informant of a racketeering enterprise conspiracy [18 U.S. Code, Sections 1961(1)(B)1512 and 1513].  In the context of the pending and long-term unresolved issues of other federal cases which are mentioned above, E. Book believes that he has been on a long-steep and unfair judicial treadmill in Connecticut for 19 years and that he has been horrificly and systematically abused and mistreated by state officials.

## D.  CAUSE OF ACTION

E. Book seeks financial compensation for civil rights and due process errors of Judge Tobin and he seeks a mandamus to order the Stamford Court to effect either of granting E. Book's Motion of November 14, 2001 regarding acquittal/rehearing or that the Court approves his Application for Waiver of Fees and Appointment of Counsel.

COUNT ONE:  On January 17, 2001, Judge Tobin approved the arrest warrant for this action, a warrant which was used to impose charges of stalking and harassment (1st-offense, non-violent Class B and Class C misdemeanors, respectively).  There was never any evidence of

stalking.  That portion of the charges was voluntarily dropped by the state.  Also, there was never any proper evidence of malicious intent regarding the harassment charges.  The arrest warrant refers to E. Book not obeying a police warning.  Notwithstanding that such presumed warning was overbroad and also that there was not fair notice, there is no case precedent where a verbal police warning, by itself, is indicative of malicious intent.  Also, there is inference in the warrant that the number of the communications by E. Book is evidence of malicious intent.  For this factor, it is relevant that during the 30-days prior to the arrest, there was record of only one communication by E. Book to M. Villamil.  Also, during the five months prior to the arrest, there was record only 12 communications by E. Book to M. Villamil, that is an average of 2.4 communications per month over a five-month period.  There is no known case reference where number of communications, by itself, is evidence of malicious intent.  Also, there is no case reference which supports that 2.4 communications per month is a high or excessive number of communications.  Further, there is undisputed evidence of legitimate purpose of E. Book's communications being debt collection and relationship closure.  Therefore, there is a clear 1st Amendment protection, a constitutional subject-matter jurisdictional bar to an official intervention or interference in E. Book's actions.  Thus, there was substantive constitutional error to Judge Tobin's approval of the arrest warrant.

COUNT TWO:  After several pre-trial hearings before Judge Bingham, Judge Hickey, Judge Commerford and Judge Nigro, during about September of 2001, Judge Tobin again appeard to administer the case.  During that time period, Judge Tobin denied various motions regarding discovery (such material also involving the proper defenses of authority of police action and of invidious discrimination, among others), regarding the validity of the protective order, and regarding vacating the arrest warrant.  Such actions by Judge Tobinappear to be in conflict with Practice Book, 1-22 which prohibits a judge who approved an arrest warrant from subsequently reviewing any matter which deals with the validity of the warrant.

COUNT THREE:  Judge Tobin also presided over the jury trial including the *voir dire,* the selection of jurors.  Points of error observed of his administration of the trial include rejection of key areas of E. Book's testimony (such as would describe E. Book's rationale for his actions), of refusing to allow E. Book to present evidence of police procedures, of refusing to allow E. Book to question M. Villamil about her accusations, of refusing to allow E. Book to question a material witness (one who had testimony of comments made by M. Villamil to third parties about E. Book), of not even hearing a motion for acquittal which E. Book sought to present a the close of evidence, of not giving to the jurors proper instructions, of giving to the jury improper advice regarding the value to be placed on Sgt. Lupinacci's presumed warning, and of showing and expressing *pro se* bias, among other matters.

As brief explanation, following the incomplete readback to the jury of Sgt. Lupinacci's testimony as to his advice to E. Book given during the voluntary meeting of January 6, 2001 (See attached pages 8 and 9 of Supplement of 1/16/03.), the jury asked Judge Tobin what value should be placed on such a warning.  Judge Tobin replied,

> I'm not supposed to give legal advice but if a police officer tells you to do something, you do it even if what he tells you is to go to church.

For reasons of constitutional error of the substance of his actions and also for the existence of multiple conflicts of interest, Judge Tobin's actions during the trial were civil rights violations.

COUNT FOUR:  On October 31, 2001, Judge Tobin denied without opposition or explanation E. Book's Motion of October 8, 2001 for arrest of judgment/acquittal/rehearing. He denied without explanation one of two pending motions for articulation.  Also, he denied without explanation E. Book's motion for pre-sentence investigation.  In addition, he imposed an unusually harsh sentence for a 1st-offense, non-violent Class C petty misdemeanor.  Further, E. Book has reason to suspect that the delay in the Court Reporter making available to him transripts of the Court hearings was by active design of Judge Tobin.

COUNT FIVE:  On November 26, 2001, Judge Tobin approved an extra condition to an appeal bond, that being for no contact with M. Villamil, that without lawful cause.

COUNT SIX:  Judge Tobin never timely addressed E. Book's Motion of November 14, 2001 for Reconsideration regarding acquittal/rehearing.

COUNT SEVEN:  Judge Tobin never timely addressed E. Book's Motion of June 16, 2002 for disqualification, among other pending motions.

COUNT EIGHT:  Judge Tobin failed to take effective steps to ensure that E. Book was aware that the intention for the scheduling of the Court hearing of January 17, 2003 was to review an expected verbal request of the state to revoke the appeal bond and impose the sentence.

COUNT NINE:  At the Court hearing of January 17, 2003, Judge Tobin improperly entertained a verbal motion from the state to impose the sentence, he failed to address E. Book's pending Motion of November 14, 2001 regarding acquittal/rehearing, a pending motion for reduction of sentence, a motion for sanction of the state attorney, he refused to receive E. Book's formal, prepared Supplement to the Motion regarding acquittal/rehearing, a Supplement which included description of newly-discovered evidence, among other matters, he improperly revoked the

appeal bond, imposed a sentence and he failed to allow a ten-day delay period for the commencement of the sentence.

COUNT TEN:

Following that action, Judge Tobin failed to ensure that other motions and pleadings were reasonably addressed.  Such pleadings included E. Book's Motion of January 20, 2003 to Vacate the Imposition of Sentence, E. Book's Motion of January 21, 2003 for Reconsideration of decision to revoke appeal bond, various supplements to his Motion of November 14, 2001 regarding acquittal/rehearing and a Motion for Stay of Sentence.

COUNT ELEVEN:

Judge Tobin failed to ensure that an endorsed notice of appeal of February 10, 2003 was made available to E. Book and he failed to ensure that complete transcripts were made available to E. Book in accord with E. Book's reasonable requests.  Such complete transcripts include for the proceedings of October 2, 2001 and also January 17, 2003.

COUNT TWELVE:

Judge Tobin violated E. Book's 1st, 8th and 14th Amendments on May 15, 2003 by ordering him without cause to not contact the Court Clerk by telephone.  Essentially, based on what is described of Judge Tobin's actions in Counts Eight through Twelve above is that he intended to lock E. Book up and throw away the key.  He actively intended and designed to harshly disrupt E. Book's life and to unreasonably obstruct E. Book's right of reasonable appeal because he knows that the case doesn't have merit and he doesn't want to admit it.  Rather, Judge Tobin has been trying to force E. Book to be the scapegoat for other people's errors.

COUNT THIRTEEN:

On January 9, 2004, Judge Nigro denied E. Book's unopposed motion for reconsideration regarding waiver of fees and appointment of counsel and other motions without a court hearing and without reasonable cause.

COUNT FOURTEEN:

On March 10, 2004, Judge Nigro denied E. Book's unopposed Motion of January 22, 2004 for reconsideration of his rulings of January 9, 2004 and he denied E. Book's unopposed Application

of February 2, 2004 for waiver of fees and appointment of counsel. The observed focus of his attention was the late issue of court jurisdiction of E. Book's Motion of November 14, 2001 regarding acquittal/rehearing. Considering that such Motion of E. Book involved an issue of procedural jurisdiction as opposed to subject-matter jurisdiction, E. Book believes that the state's failure to present timely objection constitutes a waiver of objection. Also, for being an issue of procedural jurisdiction, the Court does not have the standing to raise such an issue *sua sponte*. Further, for various reasons including of reference to Practice Book, Sec. 42-54, 63-1(b), CGS, Sec. 54-95(b), the 1st Amendment and <u>Boag v. MacDougall</u>, 454 U.S. 364, 70 L.Ed.2d 551, 102 S.Ct. 700, the Court had full procedural jurisdiction for review of that Motion. In addition, the Court continued to have jurisdiction for receiving newly-discovered evidence such as was presented in the Supplement which was offerred to the Court on January 17, 2003. Further, the Court actions of January 17, 2003 are fully appealable. Thus, there is no jurisdictional bar to Superior Court review of E. Book's Motion of November 14, 2001 regarding acquittal/rehearing and there is proper, lawful cause for the Court to approve the Application for Waiver of Fee and Appointment of Counsel.

## E.  REQUEST FOR RELIEF

5. WHEREFORE, the Plaintiff E. book demands,

For economic and non-economic damages, for punitive damages, and for reimbursement for legal costs to correct the judicial errors, FIFTY MILLION DOLLARS ($50,000,000.oo), and

A Court order that Stamford Superior Court acts in favor of E. Book's Motion of November 14, 2001 regarding acquittal/rehearing as supplemented or that the Stamford Superior Court approves the presented Application for Waiver of fees and appointment of counsel and further that the Court takes action to ensure that E. Book's pending requests for complete and accurate transcripts are satisfied.

## F.  JURY DEMAND

With reference to Fed. Rules of Civil Procedure, Sec. 38, E. Book demands a jury trial.


Respectfully submitted,

Ethan Book Jr.
P.O. Box 1385
Fairfield, CT 06825
Telephone (203) 367-8779


## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the Plaintiff in the above action, that he has read the above complaint and that the information contained in the Complaint is true and correct.  28 U.S. Code, Sec. 1746; 18 U.S. Code, Sec. 1621.


Executed at _Fairfield, CT_ on _March 16, 2004_


Ethan Book Jr.

# The Bridgeport Telegram

(Renamed Connecticut Post)

## Cityline by Kenneth Dixon

April 6, 1987

### "Tilting at Power"

A modern-day Don Quixote who is opposed to the construction of the huge regional garbage-to-energy plant in Bridgeport's South End claims he was fired from his executive position with The Connecticut Bank & Trust Co. because of pressure from Gov. William A. O'Neill to assure the success of the project.

If what Ethan Book says is true, a political pall could be cast over last year's demise of a plan in Stratford for a smaller, municipal garbage-to-energy plant. Book, who was handling preliminary funding proposals at the bank for the now-defunct Genitron plan, charges that pressures at the bank from the governor scuttled the plan.

Book is tilting at a windmill that is looming larger and larger over the South End as the plant's skeleton nears completion.

Connecticut Resources Recovery Authority officials scoff during his public statements to the state Department of Environmental Protection.

In his mission, Book often drives to Hartford to badger state officials. He's a regular in area newsrooms, constantly trying to persuade reporters and editors of the fallability of the mass-burning technology.

His many opponents are quick to point out that his criticism of the CRRA project is tainted because he is a consultant representing the preprocessing of garbage, which is then separated from its metals before it's burned. The technology, which has made many advances since the city's garbage-to-powdered fuel plant failed, is called RDF, refuse derived fuel.

Book's a gadfly with portfolio, a former Peace Corps volunteer from America's heartland. His resume is chock full of international banking experience, including funding for nuclear and coal-fired power plants and hydropower.

He was employed at CBT from Feb. 19 until Sept. 19, 1985 after leaving a Bank of America position in Manhattan to be closer to his Fairfield home and young children. He's a member of the town's Representative Town Meeting.

Book: "My first week at the bank, they requested that I arrange financing for the Stratford project and that's where things began. About halfway through the period, I noticed the first changes in management. Before, things were going extremely well and after the change it became totally opposite. They were aware that I was interested in pursuing the Stratford

project. I reviewed it in-depth and it was my understanding that I had their blessing. They accepted the point that I indicated the apparent competition between Stratford and Bridgeport, with both of them competing for customers. I felt there was support for me until early August, when I was given some conditions for (the Genitron) loan approval which did not correspond with either the norm or to our prior conversations. They required an engineering consultant report to review the technology prior to requesting loan approval of the loan committee. Normally, we would get loan approval subject to satisfactory review of the technology. It's unusual for a group to have to spend $5,000-to-$10,000 beforehand."

In an affidavit Book signed last fall, he reconstructed a conversation with a CBT government liason officer, whom he met during a reception for new CBT officers.

Officer: "I realize, Ethan, that you are arranging a loan package for the Genitron Group. Tell me. Would you be opposed to the Loan Committee postponing approval on this credit until after Aug. 31?" [August 31, 1985 was the date imposed by the CRRA as the deadline that Bridgeport area communities should join their project or else they would face a surcharge for late joining (an unlawful condition which was later disregarded by CRRA).]

Book: "Actually, as the loan officer for Genitron, I'd like to please my client and an earlier approval would benefit the project."

Officer: "Well, you see, Walter Connolly (chairman of the board for the CBT holding company) is very close to Gov. O'Neill and Gov. O'Neill wants the CRRA to do very well."

Book: "I can understand that, however, the Stratford project is a better project."

Book said he began to tell the officer why the Genitron project's fundamentals, including size efficiency and economics, were better.

Officer: "Ethan, you're not listening to me. You're giving me detail and I don't want detail. The governor wants the CRRA to do well."

Book said that on Sept. 3, the Genitron account was taken away from him. Three days later, he said he was given a written warning of performance grievances, which he contested. On Sept. 11, he was placed on formal probation. "No reason of substance was given for his action." He claims he still doesn't have a reason for why he was fired about a week later.

Lucille Brown, legal counsel in the bank's Hartford office, said last week: "I can't give ay statement and advise any corporate officers not to make any statement regarding Ethan's status."

Sec. 36a-647 page 4      (10-00)

§ 36a-647-3

phrase ''Collection Department'' or any other phrase that would convey or suggest the existence of a debt;

(b) not state such consumer debtor owes any debt nor in any other manner convey debt information;

(c) not communicate with any such person more than once with regard to a particular consumer debtor unless requested to do so by such person or unless the creditor reasonably believes that the earlier response of such person is erroneous, incomplete or no longer applicable and that such person now has correct, complete or current location information;

(d) not communicate by post card;

(e) not use any language or symbol on any envelope or in the contents of any communication effected by the mails or telegram that indicates that the communication relates to the collection of a debt; and

(f) after the creditor knows the consumer debtor is represented by an attorney with regard to the subject debt and has knowledge of such attorney's name and address, not communicate with any person other than that attorney, unless the attorney fails to respond within a reasonable period of time, but in no event more than thirty days, to communication from the creditor or unless the attorney cannot or will not provide location information to such creditor.

(g) The provisions of subsections (a), (b), (c) and (f) of this section shall not apply to any communication permitted under section 36a-647-4 (b) of these regulations.
(Effective July 6, 1979, transferred April 24, 1995)

**Sec. 36a-647-4.   Communications**

(a) **Communication with the consumer debtor generally.** Without the prior consent of the consumer debtor given directly to the creditor or the express permission of a court of competent jurisdiction, a creditor may not communicate with a consumer debtor in connection with the collection of any debt:

(1) At any unusual time or place or a time or place known or which should be known to be inconvenient or embarrassing to the consumer debtor. In the absence of knowledge of circumstances to the contrary, a creditor shall assume that the convenient time for communicating with a consumer debtor is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer debtor's location; or

(2) If the creditor knows the consumer debtor is represented by an attorney with respect to such debt and has knowledge of such attorney's name and address, unless the attorney fails to respond within a reasonable period of time, but in no event more than thirty days, to a communication from the creditor or unless the consumer debtor or attorney consents to direct communication with the consumer debtor, provided that a creditor may mail to a consumer debtor normal periodic billing statements which do not contain any message that violates the provisions of section 36a-647-5 or 36a-647-6 of the Regulations of Connecticut State Agencies; or

(3) At the consumer debtor's place of employment if the creditor knows or has reason to know that the consumer debtor's employer prohibits the consumer debtor from receiving such communication.

(b) **Communication with Third Parties.** (1) Except as provided in sections 36a-647-3 and 36a-647-4(b) (2) of the Regulations of Connecticut State Agencies, without the prior consent of the consumer debtor given directly to the creditor, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a prejudgment or post-judgment judicial remedy, a creditor may not

Page Eight                        State v. E. Book                    January 16, 2003

All the above points are substantially and fully exculpatory. These are in addition to other points of evidence which E. Book was prevented from presenting during the trial, such as information which pertained to E. Book's background, credibility and state of mind.

## 5. Defects of Court Reporter readback to jury:

The record is clear that late during the time of the jury deliberations, the jury came out with a request that the Court Reporter readback the testimony of Sgt. Lupinacci where he gave his advice/warning to E. Book. The context of the question is important. In closing arguments, prosecuting attorney Mitchell Rubin stated to the jury the following:

> . . . You heard Sergeant Lupinacci say, "I told him four or five times not to contact her." He still contacted her. He said, "Why don't you sue her if you want payment?" The answer was, no, no, to everything. (T., 10/01/01, p. 14)

Then in E. Book's rebuttal at closing, E. Book stated the following:

> . . . with all due respect, Mr. Rubin made a misfact when he said that Sergeant Lupinacci suggested that I take legal action. When Sergeant Lupinacci was on the stand if my memory serves me correctly, I should proceed civilly. There are various meanings one can take by civil action. . . . (T., 10/01/01, p. 123)

This is the setting for the request which was made by the jury of the Court Reporter during deliberations. The record is clear that the what the Court Reporter read back to the jury was as follows:

> Q. What did you tell him with respect to Mr. Book's desire to reclaim his debts?

> A. I told him the best way to do that, was to go through a civil court process, either hire an attorney or himself go through civil court. (T., 9/28/01, p. 73)

This reflects the essence and extent of what the Court Reporter presented.

However, despite the fact that E. Book had timely requested relevant transcripts prior to the October 31, 2001 sentencing for this action, such transcripts were not provided until after the sentencing. However, upon receipt of such transcripts, E. Book observed a substantive omission from the readback given to the jury by the Court Reporter. Following the question

TEXT OF LETTER SENT ON JANUARY 9, 2001:

Dear Martha,

When we were going out, I offerred you my heart. I did so in a way that was meaningful, material and real.

For reasons which appear to be related more to you not wanting to deal with your emotional and spiritual needs, you declined that offer.

In such a circumstance, trying to cast aspersions on me, slandering me, or trashing my business is not a suitable response.

Even though you may not want to hear it, my reference to you of Matthew 18:15-16 is appropriate.

Sincerely,
Ethan


TEXT OF TELEPHONE MESSAGE ON THURSDAY, JANUARY 11, 2001 (8:55 a.m.):

Good morning, Martha! This is Ethan calling. I'm calling to see if you are available for van service for the Cancum group coming up again in, in June. This is the group Stratford pick-up to Newark, 15-passenger van. It's June 16 through 24. Would you be interested and available for that? Please give me a call at 367-8779.


TEXT OF TELEPHONE MESSAGE ON THURSDAY, JANUARY 18, 2001 (3:21 p.m.):

Hi, Martha! This is Ethan. Would appreciate a call back. Thanks.

and answer quoted above which was of the direct questioning of state attorney M. Rubin, E. Book then had the opportunity to question Sgt. Lupinacci.  The official transcript reflects the following:

> Q.  During that meeting, did you suggest that the debt collection might be by way of an agent of my company?
>
> The Court:  What?
>
> Mr. Book:  Did he suggest to me in that meeting that the debt collection efforts might be done by an agent of my company, attorney or agent, some other type of agent, did you suggest during the meeting?
>
> The Witness:  What I suggested was for you to handle it civily. (T., 9/28/01, pgs. 80-81)

The available records reflect that the incomplete readback to the jury was given after 3 hours and 6 minutes of prior deliberation (exluding breaks for lunch and questions) and that after that readback, the jury continued deliberating only 6 additional minutes before advising that it was ready with a verdict.  A reasonable person would likely conclude that the nature of the omission of the Court Reporter's readback had a substantial impact on the resulting verdicts.

## 6.  Error in Judge's advice to jury:

E. Book's Motion of October 8, 2001 for acquittal provides E. Book's credible and undisputed account of presiding Judge Richard Tobin's comments made to the jury following the partial readback by the Court Reporter presented above.  With proper legal references, E. Book believes that the advice given to the jury during deliberations by the presiding Judge was erroneous and substantive and likely had a substantial impact on the resulting outcome, which was announced only minutes after the Judge's comments.

## 7.  Other relevant considerations:

E. Book believes that there are other points of substantial error in this proceeding including of the Court not allowing E. Book to present certain evidence including evidence on the issue of invidious discrimination.  In this regard, with respect to E. Book's known role in the State as whistleblower of state activities in resource recovery, there is relevant information obtained